Filed 10/31/22; Certified for Publication 11/16/22 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JAVIER GARCIA VILLALOBOS, <br><br>   Plaintiff and Appellant, <br><br> v. <br><br> CITY OF SANTA MARIA et al., <br><br>   Defendants and Respondents. | 2d Civil No. B318061 <br> (Super. Ct. No. 20CV01151) <br> (Santa Barbara County) |

      This case arises out of a police shooting that resulted in the death of Javier Garcia Gaona, Jr. (decedent). Decedent's parents filed a complaint against police officers involved in the shooting (the officers) and their employer, the City of Santa Maria (City). The officers and City are collectively referred to as "respondents." The complaint consists of four causes of action: (1) battery; (2) negligence – wrongful death; (3) negligent hiring, supervision, and training; and (4) violation of the Bane Act (Civ. Code, § 52.1).

      Decedent's father appeals from the judgment entered after the trial court granted respondents' motion for summary

judgment.  We affirm because no reasonable trier of fact could find that respondents were negligent or that their conduct was not reasonable.

*Facts*[1]

Police officers responded to a daytime report of a "suspicious person with a knife."  When the officers arrived at the scene, they saw decedent standing in the middle of the road at a major intersection.  He was holding a knife with a long blade.  The officers ordered him to drop it, but he refused.  Decedent walked to a corner of the intersection and stood in front of a gas station's price sign.  He "yelled at [the] officers," and "held the knife to his throat."  Detective Felix Diaz said to decedent, "'You know it's a sin to kill yourself.'"  Decedent responded, "'I am not going to kill myself, you are going to kill me. . . . You guys are here to hurt me.'"  Diaz "repeatedly told [decedent] that they didn't want to hurt him."

There is a video recording of the entire incident from the time the officers arrived until decedent was shot approximately 43 minutes later.  The trial court "viewed the video multiple times."  It accurately stated: "Decedent . . . point[s], gesticulate[s], and appears upset; he is talking to the officers while continuing to hold the knife."  "Decedent appears to be chattering incessantly . . . ."  "He . . . places the knife . . . to his throat, as if he plans to kill himself."

Decedent continued to engage in this conduct until the 42nd minute of the video, when Sergeant Mengel "ordered officers to deploy less-than-lethal beanbag rounds and 40mm rubber projectiles" against decedent.  Mengel testified that his

---

[1] We grant respondents' May 6, 2022 motion to augment the record.  (Cal. Rules of Court, rule 8.155.)

2

plan was "[t]o continue to negotiate with [decedent] as long as it was being effective." He resorted to the less-than-lethal, also referred to herein as "less-lethal," weapons because of decedent's "failure . . . to converse with the negotiators to establish any meaningful dialogue. [¶] And then also his change in demeanor and behavior at the sign. . . . He began looking for escape routes, or – from what I was seeing, I was very concerned he was going to leave that location." Mengel was asked, "Why wasn't any warning given that you were going to launch the less-than-lethal attack?" Mengel replied, "[W]hy would we give a warning and give someone the ability to prepare for the deployment of a less-than-lethal?" He understood "that no warning is required."

In the trial court appellant did not dispute that "Spanish speaking officers and FBI trained . . . negotiators attempted to calm [decedent] and persuade him to surrender." Appellant disputed the duration of the negotiations. Respondents claimed the negotiations continued for "approximately 40 minutes." Appellant contended that "negotiators were on [the] scene less than 22 minutes before [the] shooting started." Appellant noted that there is "a cell phone recording of negotiation[s] that lasted 19 min. and 10 sec."

The following factual summary is based on our personal observation of the video: At the video's 42 minute, 37 second mark, an order is given. In response to the order, officers lift their less-than-lethal rifles and take aim at decedent, who is still standing in front of the sign and holding the knife. The distance between decedent and the officers appears to be between 30 and 40 feet. Decedent sees the officers taking aim and makes a "go ahead" gesture with his left hand. The officers fire several times, striking decedent in the torso with projectiles. Decedent grabs

the knife with both hands and jumps up and down three times. Each time he lands on the ground, he forcefully stabs himself in the abdomen. Decedent then appears to slash his throat with the knife. He falls down, gets up, and charges full speed toward the officers. The knife is clearly visible in his right hand. The officers fire several rounds of live ammunition. Decedent collapses in the street a few feet away from the officers.

Decedent's cause of death was "multiple gunshot wounds." During the autopsy, "[b]ruising [was] noted at several locations on the torso [that] was consistent with being struck with less-lethal munitions." Decedent had "15 superficial wounds" on his neck and "small lacerations" on his abdomen.

Appellant's expert opined "that a reasonable officer acting consistent with standard police practices would have allowed the negotiation process to continue. . . . [T]he negotiation process was viable even though there were times there was an impasse. . . . [Decedent] was contained and officers were afforded the time to establish dialogue to develop strategies to bring this incident to a peaceful resolution."

*Trial Court Ruling*

Based on "the totality of the circumstances," the trial court found that respondents were "not negligent" and that "'no reasonable juror could find that the police acted unreasonabl[y].'" It therefore granted respondents' motion for summary judgment.

The trial court rejected respondents' claim that "all four . . . causes of action are subject to dismissal under res judicata/collateral estoppel/issue preclusion principles." Respondents' claim was based on appellant's prior federal court action against respondents that had been decided adversely to appellant. The trial court concluded that in the federal action "a

4

determination of actual reasonableness of the officers' conduct . . . was not made as required . . . to satisfy the requirements of collateral estoppel/issue preclusion." We do not consider this matter because respondents are entitled to summary judgment on the merits.

*Summary Judgment: Legal Principles and Standard of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 (*Aguilar*).) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A triable issue of material fact exists only if "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra,* at p. 850, fn. omitted.)

A defendant moving for summary judgment "bears the burden of persuasion that 'one or more elements of' the 'cause of action' in question 'cannot be established,' or that 'there is a complete defense' thereto. [Citation.]" (*Aguilar, supra,* 25 Cal.4th at p. 850; see also Code Civ. Proc., § 437c, subd. (p)(2).) The defendant also "bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact." (*Aguilar, supra,* at p. 850.) Where, as here, the burden of proof at trial is by a preponderance of the evidence, the defendant must "present evidence that would require such a trier of fact *not* to find any underlying material fact more likely than

5

not." (*Id.,* at p. 845.)  If the defendant carries this burden, the burden of production shifts to the plaintiff "to make a prima facie showing of the existence of a triable issue of material fact." (*Id.,* at p. 850.)  The plaintiff must present evidence that would allow a reasonable trier of fact to find the underlying material fact more likely than not.  (*Id.,* at p. 852.)

On appeal we conduct a de novo review, applying the same standard as the trial court.  (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064.)  Our obligation is ""to determine whether issues of fact exist, not to decide the merits of the issues themselves. . . ."" (*Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1228.)  We must "consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom [citation], and must view such evidence [citations] and such inferences [citations], in the light most favorable to the opposing party."  (*Aguilar, supra,* 25 Cal.4th at p. 843.)

"We must presume the judgment is correct . . . ." (*Jones v. Department of Corrections and Rehabilitation* (2007) 152 Cal.App.4th 1367, 1376.)  "'As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. . . .' [Citation.]" (*Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 230.)

*Appellant's Claimed Triable Issues of Material Fact*
*Are Based on the Officers' Preshooting Conduct*

There is no triable issue of material fact whether the officers were justified in using deadly force when decedent charged at them while holding a knife.  "'[A]n officer may

reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.  In these circumstances, the Courts cannot ask an officer to hold fire in order to ascertain whether the suspect will, in fact, injure or murder the officer.  The high numbers of officer mortalities in recent years illustrate the unreasonableness of such a notion.'" (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 345 (*Martinez*).)

Appellant states that he "has not disputed that the shooting *became* reasonable at some point but submit[s] that it only became so on account of the intentional and negligent actions of the Respondents."  This is the key issue.  Appellant maintains "that reasonable jurors are likely to conclude that the officers acted unreasonably when they used less-lethal force against an individual clearly experiencing a mental health crisis who presented no immediate threat to anyone but himself."  In other words, appellant is arguing that negligence in the officers' preshooting conduct resulted in decedent's suicidal assault with the knife:  "[T]he unwarranted deployment of less-lethal weapons led to [his] death a few seconds later."

"[T]he reasonableness of a peace officer's conduct must be determined in light of the totality of circumstances.  [Citations.] . . . [P]reshooting conduct is included in the totality of circumstances surrounding an officer's use of deadly force, and therefore the officer's duty to act reasonably when using deadly force extends to preshooting conduct." (*Hayes v. County of San Diego* (2013) 57 Cal.4th 622, 632 (*Hayes*).)

*The Trial Court Properly Granted Summary Judgment*

As to all causes of action, respondents satisfied their initial burden of production as well as their burden of persuasion for

7

summary judgment purposes. The trial court noted that the undisputed facts and the video show the officers "clearly were faced with a very dangerous situation – a man carrying a large blade, in a public area with civilians present, who was obviously unstable, mercurial, and distraught, perhaps under the influence of drugs, who repeatedly refused to comply with their demands to drop the knife and submit to their authority, all during the course of a 40-minute long plus interaction and negotiations. . . . [¶] . . . It is uncontested that decedent placed a knife under his own throat and threatened to kill himself during the entirety of the standoff . . . ." The officers "were not obliged to let [decedent] go, and could use reasonably necessary force to disable him. The fact th[at] less-than-lethal force . . . was unsuccessful is not the reason deadly force was needed – and cannot be the basis for liability in any realistic way. It was decedent's conduct in charging the officers with [the] knife that was the cause of the death."

The burden shifted to appellant "to make a prima facie showing of the existence of a triable issue of material fact" whether the officers had acted unreasonably during their confrontation with decedent. (*Aguilar, supra*, 25 Cal.4th at p. 850.) Appellant claims "there were a myriad of triable issues." He lists them as follows: (1) whether Spanish-speaking negotiators "talked to [decedent] for 40 minutes" or "for less than 22 minutes"; (2) whether decedent was preparing to flee when he was shot with the less-lethal weapons; (3) whether "Sgt. Mengel ordered the deployment of less-lethal weapons to prevent [decedent] from running"; (4) whether "Sgt. Mengel just wanted to see how [decedent] would react" to being struck with the less-lethal projectiles and had "no plan"; (5) whether decedent posed a

8

threat to the officers when they fired the less-lethal weapons; (6) whether decedent was "seeking to escape when he was fired upon" with the less-lethal weapons; (7) whether the officers were negligently trained because they had been taught not to provide a warning before firing the less-lethal weapons; (8) whether "it was negligent not to have been trained to develop a plan as to how to proceed after deploying less-lethal weapons"; (9) whether "training by the [C]ity was negligent" because the officers "deliberately targeted [decedent's] heart area with less-lethal projectiles even though manufacturers state that impact in that area should be avoided"; (10) whether "the [C]ity was negligent in the mental health training provided to officers"; and (11) whether "[t]he credibility of the [officers] was further compromised by Respondent City of Santa Maria allowing four of the Respondent officers to travel together in the same vehicle before being questioned by investigators."

"In order to prevent the imposition of a summary judgment, the disputed facts must be 'material,' i.e., relate to a claim or defense in issue which could make a difference in the outcome." (*Burton v. Security Pacific Nat. Bank* (1988) 197 Cal.App.3d 972, 976, disapproved on other grounds in *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 351.) Appellant's disputed facts are not material to the underlying question whether the officers' use of force was reasonable. "[A]s the nation's high court has observed, '[t]he "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' [Citation.] In addition, '[a]s long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the "most

9

reasonable" action or the conduct that is the least likely to cause harm and at the same time the most likely to result in the successful apprehension of a violent suspect, in order to avoid liability for negligence.' [Citation.] Although preshooting conduct is included in the totality of circumstances, we do not want to suggest that a particular preshooting protocol . . . is always required. Law enforcement personnel have a degree of discretion as to how they choose to address a particular situation. Summary judgment is appropriate when the trial court determines that, viewing the facts most favorably to the plaintiff, no reasonable juror could find negligence." (*Hayes*, *supra*, 57 Cal.4th at p. 632.)

Viewing the facts most favorably to appellant, no reasonable juror could find that respondents were negligent or had acted unreasonably. The officers patiently waited approximately 40 minutes before resorting to less-than-lethal weapons. The negotiations with decedent had been futile. He was armed with a deadly weapon, was behaving erratically, and was also suicidal. He presented an immediate threat of physical harm to himself. At any time he could have used the knife to inflict a grievous injury upon himself. Instead of calming down, he appeared to be growing more agitated.

There was no legitimate reason to continue a hopeless standoff that had disrupted the flow of traffic and was consuming police resources. The video shows that the police had closed all lanes at a major intersection. Seven officers were present. The officers reasonably used less-lethal weapons in an attempt to safely subdue decedent, disarm him, and end the crisis. The projectiles from the less-lethal weapons caused no injury other than bruising.

Appellant maintains that, when decedent ran toward the officers while holding the knife, he was "attempt[ing] to run from the pain" caused when he was "struck by multiple pain-inducing, less-lethal rounds." (Bold omitted.) We disagree. Decedent charged the officers in an apparent attempt to commit "suicide by cop." "'"Suicide by cop" refers to an instance in which a person attempts to commit suicide by provoking the police to use deadly force.'" (*City of Simi Valley v. Superior Court* (2003) 111 Cal.App.4th 1077, 1079, fn. 1.) Despite stabbing himself three times in the abdomen and slashing his throat with the knife, decedent was unable to kill himself. So he provoked the police into killing him.

Appellant faults Sergeant Mengel for not having a plan as to how to proceed without the use of deadly force after the firing of the less-lethal weapons: "A K-9 [police dog] could have been released after the firing of less-lethal. Officers with shields could have rushed [decedent]. Tasers could have been deployed. The SWAT team could have been utilized. A water cannon could have been fired." But "'[t]here is no precedent . . . which . . . requires law enforcement officers to use all feasible alternatives to avoid a situation where deadly force can justifiably be used. . . .'" (*Martinez*, *supra*, 47 Cal.App.4th at p. 348.) "It would be unreasonable to require police officers in the field to engage in the sort of complex calculus that would be necessary to determine the 'best' or most effective and least dangerous method of handling an immediate and dangerous situation . . . ." (*Brown v. Ransweiler* (2009) 171 Cal.App.4th 516, 537-538.) "'We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. . . .'" (*Martinez*, *supra*, at p. 343.)

11

Because appellant did not carry his burden "to make a prima facie showing of the existence of a triable issue of material fact" whether the officers' use of force was negligent or unreasonable (*Aguilar, supra*, 25 Cal.4th at p. 850), the trial court properly granted respondents' motion for summary judgment.

*Disposition*

The judgment is affirmed. Respondents shall recover their costs on appeal.

YEGAN, J.

We concur:

GILBERT, P. J.

BALTODANO, J.

12

Timothy Staffel, Judge

Superior Court County of Santa Barbara

_____

William L. Schmidt, for Plaintiff and Appellant.

Ferguson, Praet & Sherman and Bruce D. Praet, for Defendants and Respondents.

Filed 11/16/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JAVIER GARCIA VILLALOBOS,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SANTA MARIA et al.,<br><br>    Defendants and Respondents. | 2d Civil No. B318061<br>(Super. Ct. No. 20CV01151)<br>(Santa Barbara County)<br><br>ORDER CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT] |

THE COURT:

      The opinion in the above-entitled matter filed on October 31, 2022, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.


GILBERT, P. J.        YEGAN, J.        BALTODANO, J.